**FILED**

SEP 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Donovan J. Leighton
Pro Se
11101 Georgia Avenue Apartment # 263
Wheaton, Maryland 20902
301-933-0690

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

DONOVAN J. LEIGHTON
11101 Georgia Avenue Apartment # 263
Wheaton, Maryland 20902
301-933-0690

                        Plaintiff,                    **COMPLAINT**

    -against-
                                                      **PLAINTIFF DEMANDS
                                                      TRIAL BY JURY**
ALBERTO GONZALES, in his official capacity
as ATTORNEY GENERAL,
U.S. DEPARTMENT OF JUSTICE                            CASE NUMBER  1:05CV01835
950 Pennsylvania Avenue, N.W.
Washington, DC 20530                                  JUDGE: Henry H. Kennedy

                        Defendant,                    DECK TYPE: Employment Discrimination

---                                                   DATE STAMP: 09/16/2005

### COMPLAINT

1.   Plaintiff Donovan J. Leighton brings this action for legal and equitable relief against

Alberto Gonzales, in his official capacity as Attorney General of the United States under Title

VIII of the Civil Rights Act, as amended, 42 U.S.C. Section 2000e and 42 U.S.C. Section 1981a.

### NATURE OF THE ACTION

2.   This complaint arises out of a series of events occurring at Federal Bureau of

Investigation Headquarters (FBIHQ) in Washington, D.C. The Plaintiff is a Supervisory Special

Agent (SSA) of the Federal Bureau of Investigation (FBI) assigned to the Office of International

Operations (OIO). The Plaintiff alleges that he was subjected to pattern of disparate treatment and retaliation based on his race (African-American) and his prior participation in protected activity in violation of Title VII of the Civil Rights Act of 1964. This illegal discriminatory conduct was severe and pervasive and created a hostile work environment of the Plaintiff interfering with his official duties.

3.    As detailed herein, Plaintiff has been subjected to various acts of disparate treatment discrimination and retaliation which taken together and/or separately have affected his ability to secure promotions and otherwise succeed as a FBI SSA.

4.    Plaintiff's repeated attempts to redress these issues with FBI management failed and he has suffered retaliation for opposing these unlawful actions. After filing equal employment opportunity (EEO) complaints regarding this illegal conduct, Plaintiff suffered further retaliation and reprisals from FBI management.

### JURISDICTION

5.    Jurisdiction in this case exists pursuant to 42 U.S.C. Section 2000e et seq. and 42 U.S.C. Section 1981a. Venue is proper in this District pursuant to 28 U.S.C. Section 1391 (e) and 42 U.S.C. Section 2000e-5(f)(3) because the majority of the unlawful actions occurred at FBIHQ in Washington, D.C. and many of the relevant employment records are maintained and administered there.

6.    The Plaintiff made a timely administrative complaint of discrimination with the agency and exhausted his administrative remedies and 180 days have passed since the initial filing of his complaint.

## THE PARTIES

7.    The Plaintiff is an 1811-series SSA with the FBI who holds a GS-15 rating.  The

Plaintiff served in the FBI's OIO and was subject to OIO's chain of command.  The Plaintiff is an

African-American and has been employed by the FBI since 1978.  Over the past 28 plus years the

Plaintiff has served in the FBI's Los Angeles Division, Inspection Division, Criminal

Investigative Division, and former Personnel Division.  The Plaintiff has extensive international

operations experience having served as a Legal Attache at Legat Bridgetown during the period

1998 - 2001 as well as temporary duty assignments at Legat Panama City, Legat Riyadh, Legat

Manila, and Legat Sanaa.  The Plaintiff has served in OIO for four years and served in its

predecessor organization, the Office of Liaison and International Affairs, for one year.  The

Plaintiff further served as the Technical Assistance Manager for the International Criminal

Investigative Training Assistance Program's initiative to stand up the Panama National Police as

a law enforcement organization subordinate to democratic authority following Operation Just

Cause.

8.    The Plaintiff has a long history of opposition to employment discrimination in the

FBI which is well known to FBI management.  While undergoing New Agents Training in 1978

the Plaintiff protested the practice of firearms instructors causing the termination of minority and

female trainees by withholding instruction.  In 1982 the Plaintiff utilized the FBI's EEO process

to gain the opportunity to contribute to the FBI's early counter-drug efforts.  In the mid-1980s the

Plaintiff was a vocal opponent of the notorious, unconscionable, and racially motivated treatment

of former SSA Donald Rochon.  In the early 1990's the Plaintiff fought to establish some of the

FBI's earliest anti-gang initiatives which brought relief to the predominantly African-American

community of South-Central Los Angeles. While serving in Panama the Plaintiff was forced to

resort to EEO process when his supervisor presented him with an "Exceptional" performance

appraisal while orally communicating a lower rating to FBIHQ without his knowledge. The

plaintiff was a leader and named plaintiff in the matter of Emmanuel Johnson Jr. Et Al. v. Janet

Reno, Attorney General of the United States (U.S.C.D., District Of Columbia, Civ. Action No.

93-0206), more popularly known as the Black Agents Don't Equality (BADGE) Class Action.

While acting as Chief of the FBI's Performance, Recognition, and Awards Unit the Plaintiff

attempted to ensure that no personnel actions involving the FBI's performance appraisal system

were in violation of Title VII or FBI EEO policies which became a subject of controversy

resulting in retaliation in the form of a derogatory 1997 inspection report. Through the FBI's

EEO process, the Plaintiff caused the FBI to agree to make changes in the language of this report.

     9.    The Plaintiff's actions as a class representative of the BADGE class action and Chief

of PRAU, in particular, brought him into conflict with former Special Agent in Charge (SAC)

Bob C. Reutter. Within the FBI SAC Reutter was notorious for his opposition to FBI EEO

policies. SAC Reutter was formerly the squad supervisor of former FBI Director Louis J. Freeh.

Soon after being named FBI Director, former Director Freeh took the unprecedented action of

naming SAC Reutter to concurrently hold the positions of Assistant Director of the Inspection

Division and SAC of the Philadelphia Division with additional expansive responsibilities relating

to changes in the inspection process, the promotion system, and performance appraisal system. In

this capacity SAC Reutter was responsible for the promotion of 12 white female SSAs eligible for

promotion to Assistant Special Agent in Charge (ASAC) before a more rigorous ASAC selection

system was implemented. SSA Sandra Fowler was one of the 12. The 13th female SSA eligible

for promotion at that time was SSA Johnnie Gibson, the first African-American FBI SA. SSA Gibson was not promoted.

    10.    SAC Reutter falsely represented to Director Freeh that representatives of the BADGE class action had consented to proposed changes in the performance appraisal system which would have limited appeals of performance appraisals to the division head level. When the Plaintiff became aware of this he drafted a memorandum that made clear that the BADGE class members did not agree with the proposed changes and explicitly stated that anyone who would proposed further circumscribing the limited administrative due process protecting FBI employees should cease "trying to fill J. Edger Hoover's pumps."

    11.    Around the same time it was revealed that SAC Reutter was organizing a conference in Orlando, Florida, ostensibly to discuss changes in the performance appraisal system which had the real purpose of subsidizing opportunities to socialize with SSA Fowler at taxpayer expense who was then, on SAC Reutter's recommendation, acting as ASAC of the Tampa Division. When this became public SAC Reutter was stripped of his collateral responsibilities and confined to the Philadelphia Division. SAC Reutter subsequently retired while under investigation for falsely claiming travel expenses in connection with the "Pottsgate" scandal.

    12.    As PRAU Chief the Plaintiff adjudicated two performance appraisal appeals adversely to SAC Reutter. The Plaintiff was subsequently inspected by Inspector Larry McCormick while serving as Chief of the Pay Administration & Support Staffing Unit (PASSU). Inspector McCormick was a close associate of SAC Reutter who served under him as field supervisor in the Detroit Division. Inspector McCormick was responsible for a critical evaluation of PASSU which ostensibly identified "racial tension" in PASSU though conceding that "few

examples were provided during the interviews." Nonetheless, Inspector McCormick went on to make the extraordinary recommendation that the Office of Equal Employment Opportunity Affairs (OEEOA) intervene to "develop and implement a plan to address racial tensions within PASSU." On November 23, 1997, then FBI Chief Equal Employment Opportunity Officer Kathleen D. Koch advised that her staff had reviewed relevant Inspection Staff inspection papers and discerned no plausible evidence of "underlying racial tensions within PASSU warranting OEEOA intervention." In connection with the Plaintiff's EEO complaint relating to Inspector McCormick's report, the FBI agreed to change the language of the report.

13. In late 1997 Congresswoman Maxine Waters, a member of the Congressional Black Congress, requested the Plaintiff to participate in a hearing relating to employment discrimination in federal law enforcement. Congresswoman Waters later directed correspondence to Director Freeh admonishing not to engage in retaliation.

14. Defendant Alberto Gonzales is sued in his official capacity as Attorney General of the United States. As part of his official capacity as Attorney General of the United States. As part of his official duties he is responsible for the FBI. In connection with the Department of Justice, the FBI is responsible for enforcing the civil rights laws of the United States.

## SPECIFIC ALLEGATIONS

a. <u>Non-selection For Participation In The 45th Session Of The Department Of State Foreign Service Institute Senior Seminar.</u>

15. The Plaintiff was ranked by OIO's local career board (LCB) as the number one candidate for participation in the 45th Session of the Department Of State Foreign Service Institute Senior Seminar. Notwithstanding this ranking, the Special Agent Mid-Level

Management Selection (SAMMS) Board selected another candidate. The Plaintiff is aware that the SAMMS Board infrequently overrules the ranking of a LCB. The Plaintiff was informed that he was not selected because the SAMMS board had determined that the Senior Seminar was intended to be an introductory course for managers with no previous legal attache experience and the Plaintiff had extensive international experience. The candidate selected had little or no international experience. This explanation was obviously given as a pretext in view of the fact that the Senior Seminar was described in its vacancy announcement as "the most senior diplomatic readiness training offered by the U. S. Government," attendees needed considerable international experience in order to make meaningful contributions to the program and other former Legal Attache personnel had been selected to attend previous sessions of the seminar.

16.    Former Deputy Assistant Director (DAD) Francis Gallagher participated as a member of the SAMMS Board which considered the Senior Seminar vacancy. DAD Gallagher was a very close associate of former SAC Reutter. The Plaintiff was present at a Executive Development Institute session when DAD Gallegher had described SAC Reutter as his idol. DAD Gallegher was responsible for the Inspection Staff during a period when it was described to the Plaintiff by former SAC Gerald Mack, who was an inspector at that time, as a "Reutter shop." DAD Gallegher stated that the SAMMS Board recommended SSA Blake Hamilton, a white male and ASAC in the Chicago Division, because he possessed more managerial experience than the Plaintiff. It became obvious, however, that this was a pretext when SAC Roderick Beverly later commented in front of several witnesses that SSA Hamilton had only been selected for the position "to get rid of him." The Plaintiff has been informed that SSA Hamilton had a conversation with former OIO Section Chief Michael Pyszczymuka that SSA Hamilton had made

comments suggesting that he had very little idea what the Senior Seminar was about. Further, the Plaintiff was told by SSA Hamilton that following completion of the Senior Seminar he was not supported by OIO management for further promotion and this contributed to his decision to remove himself from FBI management and accept a transfer to a GS-13 in the Denver Division.

17.    Former DAD Thomas Locke participated in the SAMMS Board and stated that he was aware of an unfavorable inspection that the Plaintiff was responsible for while serving as Legat Bridgetown. DAD Locke previously served as an Inspector under former SAC Reutter when he was in charge of the Inspection Staff. DAD Locke, however, withheld from the SAMMS Board information that he knew, or reasonably should have known, which would have led a reasonable person to conclude that the central finding of the inspection was unreasonable and unsubstantiated. Specifically, the Inspection Staff, led by then Inspector Kenneth Kaiser, leapt to the conclusion that the Plaintiff was responsible for a personality conflict with a subordinate resulting in "an unfavorable work environment" and "low office morale". In doing so Inspector Kaiser ignored a clear, dramatic, and significant personnel security issue relating to the subordinate. Inspector Kaiser was also a close associate of former SAC Reutter who was a close friend of his father who was also employed in the FBI. Further, Inspector Kaiser was a former subordinate of Inspector McCormick, who was responsible for the derogatory but erroneous inspection of PASSU discussed above, when Inspector McCormick was a supervisor under former SAC Reutter in the Detroit Division. On January 28, 2000, the Plaintiff entered into settlement agreement concerning Employment Discrimination File F-97-5118 relating to the PASSU inspection in which the FBI agreed to change the language of the inspection report. The Legat Bridgetown inspection began seven days later on February 7, 2000.

18.    Less than 30 days after the Legat Bridgetown Inspection further information, of an order of magnitude several times greater than the original information, raised significant, if not unprecedented personnel security concerns regarding the subordinate and the subordinate's spouse.  Still later the subordinate's refusal to provide candid and complete information concerning an early morning auto accident involving the spouse, and a still unidentified female SA who been visiting Barbados, raised further questions.  This compelled the conclusion of OIO management that, notwithstanding the inspection, the Plaintiff's management was not the source of the problems at Legat Bridgetown.  This was reflected in a 2000 performance appraisal in which the Plaintiff was rated overall "Exceptional" and "Superior" in the supervision of subordinates.  Specifically addressing the Legat Bridgetown Inspection, the performance appraisal report stated, concerning the Plaintiff's performance in the Supervision of Subordinates Critical Element, that:

> "Legat Leighton's cited deficiencies can only be
> fairly and properly considered within the context
> of his concurrent achievement of effective liaison
> throughout Legat - Bridgetown's territory resulting
> in contacts which significantly advanced the mission
> of the FBI as significant achievement in all program
> areas.  Legat Leighton's performance in this critical
> element was amply demonstrated in his handling
> of sensitive issues pertaining to both of his
> subordinates which were uniformly addressed

in the interest of preserving the credibility and

integrity of the FBI."

19.    Former Assistant Director (AD) Sheri Farrar participated in the SAMMS Board and

stated that the SAMMS Board did not agree with the ranking of OIO LCB because SSA Hamilton

more management experience and because of the unfavorable Legat Bridgetown inspection.  AD

Farrar was one of the 12 white females specially selected for promotion to ASAC by former SAC

Reutter.  She was further a close friend of former Executive Assistant Director (EAD) Kathleen

McChesney who been SA Hamilton's SAC in the Chicago Division.

**b.    <u>Non-selection For Legat Manila</u>**

20.    The Plaintiff was ranked as the number one candidate for the Legat Manila vacancy

by the OIO LCB.  This was based in large part by division head comments provided by SAC

Beverly.  SAC Beverly's division head comments included the following statements:

"SSA Donovan J. Leighton is very highly qualified for the

posted position.  He recently returned from a 45 day TDY

deployment to Legat Manila where he was exposed to all aspects

of the office's operations during a period when it was experiencing

an extremely high operational tempo, primarily in connection with

the resolution of the Martin and Gracia Burnham hostage taking

by the Abu Sayyaf Group (ASG).  He was directly involved in an

unprecedented arrest/returns of four fugitives in fourteen days

which was featured on the FBI's Intranet Web Page and was one of

three SSAs commended by the Special Charge of the Miami

Field Office of the Internal Revenue Service for his role in the arrest/return of two of the fugitives...";

"SSA Leighton was extremely effective as Legat Bridgetown during the period 1998 - 2001. He established productive liaison with approximately 100 officials at various levels of eight independent countries, three French overseas departments, two British overseas territories, and Dutch St. Maarten...The quality and depth of the coverage he established was reflected in arrest/return of a fugitive wanted by the Omaha Division a for a multi-million dollar investment fraud and the seizure of his $1.5 million yacht. The subject's wife, who had traveled to the Eastern Caribbean with a private investigator in an attempt to locate the fugitive, later commented that she thought she had been surveillance during her travels because everywhere she went 'the FBI had already been there'";

"SSA Leighton developed extremely beneficial relationships throughout United States Embassy - Bridgetown's Country Team which was reflected by request of the Charge...and Narcotics Assistance Section representative for the deployment of additional FBI Sas. The quality of SSA Leighton's intra-Country Team liaison was demonstrated by his effectiveness in obtaining Chief Of Mission concurrence to implement the Miami Division's "Jazzbar"

Group I Undercover operation which target the major money launderers and con artists operation in the Eastern Caribbean. SSA Leighton's successor commented that 'The fact that we even allowed to go forward with this case at all is largely to the credit of former Legat Leighton'"; and

"Since September 11, 2001, SSA Leighton has been extremely focused on the FBI's primary mission of preventing another catastrophic terrorist attack. Within minutes of the second aircraft crashing into the World Trade Center he volunteered his services without reservation. When asked if would deploy to Legat Riyadh SSA Leighton's immediate response was that he was 'good-to-go anytime, anywhere to contribute to the war effort.' SSA Leighton subsequently deployed to Legat Riyadh where he worked 22 consecutive days before returning to headquarters. SSA Leighton then assumed Program Manager responsibility for some of the busiest Legats in connection with PENTBOMB to include Legats Almaty, Amman, Islamabad, Riyadh, and Tel Aviv. SSA Leighton additionally took the initiative to act as the primary point of contact between the SIOC Executive Watch and the Legat Program and routinely contributed to the advance of the PENTBOMB investigation through daily contact with the full range of impacted Legats. In this role SSA Leighton was personally responsible

for the identification of a Saudi Airlines employee who came to

the attention of President Bush when his application was found in an

Al Qaeda training camp in Afghanistan. By working with several

Arabic linguists SSA Leighton was able to identify the Saudi

Airlines employee as identical with an Al Qaeda fighter being detained

at Gauntanamo Bay. Since September 11, 2001, SSA Leighton has

engaged in extensive study concerning Al Qaeda and related organizations."

21.    Late in the process SAC Beverly submitted an addendum contradicting his own

division head comments. This addendum ostensibly noted an inconsistency information provided

to the SAMMS Board. Specifically, SAC Beverly took issue with the LCB's comment that the

Plaintiff had been extremely effective at Legat Bridgetown asserting that the Plaintiff had been

found "effective but inefficient" during the 2000 inspection. The Legat - Manila SAMMS Board

members indicated that SAC Beverly's comments played a role in their decision not to select the

Plaintiff.

22.    The pretextural nature of SAC Beverly's remarks are obvious for a number of

reasons. Most prominent is the fact that he had already endorsed the division head comments

which included the description of the Plaintiff as highly effective as Legat Bridgetown. Secondly,

the undisputed descriptions of performance contained in the division head comments are

consistent with the characterization of the Plaintiff as highly effective. Thirdly, SAC Beverly, as

a member of the FBI's Senior Executive Service, knew or reasonably should have known that

within the FBI's management doctrine determinations of "effectiveness" are distinct from

determinations of "efficiency". Therefore it is possible that a manager could be determined to be

"highly effective" though to some degree "inefficient". Despite the highly biased and

disinformative nature of his report, Inspector Kaiser conceded the effectiveness of Plaintiff's

management by comments such as "Overall, U. S. Embassy officials were laudatory in their

expressions of appreciation for the work accomplished by Legat Leighton and his staff," "Legat

Leighton was described by outside contacts as highly motivated, well respected, hard working and

professional," "Christopher Burgess, Commissioner, Royal Montserrat Police Force believed that

Legat Leighton projected an attitude of extreme helpfulness," "Legat, Bridgetown, had conducted

significant investigations in all of its priority investigative programs," "Legat Leighton was

credited with having taken the lead in the development and evolution of four other training

initiatives in support of 101 law enforcement officers with the Legat's territory," "Outside

contacts, representative of the law enforcement, intelligence, and U. S. Embassy communities,

confirmed strong liaison and productive working relationships in those areas where liaison had

been initiated," and "Legat Leighton provided leadership through his experience as an

investigator and through his broad understanding of regional cultures." Further, the Plaintiff was

rated as overall "Exceptional" in his 2000 performance appraisal which contains numerous

examples supportive of the statement that the Plaintiff was highly effective as Legat Bridgetown.

**c.    Failure To Receive Incentive Award**

23.    In November, 2002, following Plaintiff's non-selection for the Legat Manila

position, Plaintiff's former supervisor, SSA Cary Gleicher, told the Plaintiff that he wanted to

recommend the Plaintiff for an incentive award and requested that the Plaintiff provide him with

a summary of his performance in International Operations Unit II. The Plaintiff provided this

documentation to SSA Gleicher. In December, 2002, the Plaintiff learned that the incentive

award recommendation had not been processed. The circumstances strongly suggest that the incentive award recommendation was not processed because OIO management believed that the supporting recommendation would have been probative in connection with Plaintiff's EEO complaint in connection with his non-selection for Legat Manila.

24.   Former OIO SC Pyszczymuka stated that the incentive award recommendation relating to the Plaintiff because of a budget shortfall. SC Pyszczymuka stated that he and SAC Beverly had agreed to provide incentive awards to Legats and ALAT first and those who did not receive an award in the next fiscal year. OIO management's true purpose in withholding the incentive award recommendation was made obvious, however, when an incentive award recommendation was finally submitted which was heavily edited to significantly understate the Plaintiff's performance.

**d.    Denial Of Opportunity To Participate In Investigation**

25.   During March, 2003, the Plaintiff participated in a Counterterrorism Watch meeting in which requests by Director Mueller relating to the investigation of Adnan G. El-Shukri-Jumah's connections to Trinidad and Guyana were discussed. El Shukri-Jumah was described as a top level Al Qaeda operator on par with Mohammed Atta. The Trinidad connection resonated with the Plaintiff because of information the plaintiff reported from Bridgetown in 1998. Additionally, the Plaintiff had been very successful in fugitive investigations in Trinidad while acting as Legat Bridgetown.

26.   On March 26, 2003, the Plaintiff learned that Legat Susan Chainer had requested assistance in connection with leads related to El Shuki-Jumah. Plaintiff immediately volunteered to deploy to Trinidad to assist. SSA Fowler immediately replied that El Shukri-Jumah

investigation was "not a priority" and that I could not be spared. The true purpose of this denial, given the Plaintiff's demonstrated success in international fugitive investigations, particularly in Trinidad and most recently in the Philippines, was to constrain the Plaintiff's performance, which could reasonably be anticipated to be at a high level, for fear that this would be probative in connection with the EEO complaint related to his non-selection for Legat Manila. The assertion that could not be spared is belied by the fact that SSA Fowler authorized the Plaintiff to go on annual leave. The Plaintiff is aware should have been able to handle the unit while the Plaintiff was deployed to Trinidad as the Plaintiff handled the unit with no other SSAs for a period of 60 days. Plaintiff is aware that on numerous occasions OIO has deployed its personnel to augment Legal Attaches.

**e.    Malicious Employee Assistance Program Referral**

27.    On March 30, 2003, the Plaintiff drafted an e-mail to his Executive Assistant Director in which he expressed his concerns relating to employment discrimination by OIO management, OIO's performance in the War Against Terrorism, and underutilization of OIO resources. All of the recipients were in my chain of command. No FBI policy prohibits such communications. Director Mueller had publically stated that he encourages FBI employees to express their concerns to management.

28.    On April 1, 2003, SC Pyszczymuka, in collusion with SSA Fowler, made a malicious Employee Assistance Program referral in retaliation for the Plaintiff's e-mail ostensibly for "anger management". The malicious nature of this referral is obvious because at the time he made it the Plaintiff presented him with correspondence from Dr. Janice Berry Edwards, DSW, dated the Saturday before. Dr. Edwards is a psychotherapist who was formerly employed in the

FBI's EAP for approximately 10 years and is extremely knowledgeable concerning the Legal

Attache Program. Dr. Edwards' correspondence stated:

> "His judgement is sound; he is firmly posited in his sense of
>
> ethics and integrity. SSA Leighton's reliability is unquestionable as
>
> demonstrated by numerous examples in his performance at FBI
>
> Headquarters since I have known him. SSA Leighton has had TDY
>
> tours of duty (Saudi Arabia and the Philippines) to perform special
>
> operations upon the request of FBI management. His performance
>
> response to stressful and hazardous assignments has been exemplary.
>
> . . . .In no way does the psychotherapeutic work he has done and
>
> continues to have any adverse implication for his ability to carry
>
> firearm or perform in high risk, high stress situations."

## FOR A FIRST CAUSE OF ACTION
### Title VII, 42 U. S. C. Section 2000 et seq. and 42 U.S.C. Section 1981a
### ("Hostile Work Environment")

29.     SSA Leighton repeats and realleges the allegations contained in paragraphs 1 - 28

inclusive as if they were set forth in here in full.

30.     The Plaintiff was subjected to a patter of disparate treatment and harassment based

on his race ("African-American) at FBIHQ. This illegal discriminatory conduct was pervasive

and severe, creating a hostile work environment for the Plaintiff interfering with his official

duties.

31.     The Plaintiff took reasonable steps to report this illegal conduct through the FBI

chain of command but FBI management failed to investigate, stop, abate or otherwise remedy this

hostile work environment.

32.    As a direct and proximate result of Defendant's unlawful employment practices as described above, the Plaintiff suffered the indignity of discrimination, humiliation, mental anguish, severe emotional distress and other tangible harm in terms of career enhancing opportunities and further consequential damages as a result of this conduct.

33.    Defendant's conduct as described above constitutes a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, as amended, and the Civil Rights Act of 1881, 42 U.S.C. Section 1981a.

**FOR A SECOND CAUSE OF ACTION**
**Title VII, 42 U.S.C. Section 2000 and 42 U.S.C. Section 1981a**
**("PATTERN AND PRACTICE")**

34.    SSA Leighton ("Plaintiff") repeats and realleges the allegations contained in paragraphs 1 - 28 inclusive as if they were set forth in here in full.

35.    FBIHQ management has engaged in a pattern and practice of intentional discrimination under Teamsters v. United States, 431 U.S. (1977), against the Plaintiff (African-American) in violation of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, as amended, and the Civil Rights Act of 1991, 42 U.S.C. 1981a. Specifically, FBIHQ management has treated the Plaintiff more harshly than similarly situated Caucasian SSAs with regard to promotions, assignments, awards, bonuses and other forms of official recognition. Taken together and/or separately, the above employment practices have adversely affected the ability of the Plaintiff to secure promotions or otherwise succeed in the FBI

36.    As a direct and proximate result of the Defendant's unlawful employment practices as described above, the Plaintiff suffered the indignity of discrimination, humiliation, mental

anguish, severe emotional distress and other tangible harm in terms of career enhancing

opportunities and further consequential damages as a result of this conduct.

### FOR A THIRD CAUSE OF ACTION
#### Title VII, 42 U.S.C. Section 2000 et seq. and 42 U.S.C. Section 1981a
#### ("DISPARATE IMPACT")

37.    SSA Leighton ("Plaintiff") repeats and realleges the allegations contained in

Paragraphs 1 - 28 inclusive as if they were set forth in here in full.

38.    Plaintiff maintains that the policies, practices and procedures of the FBI have

operated to have disparate impact on African-American Special Agents with regard to

promotions, assignments, awards, bonuses and other forms of official recognition. The disparate

impact of the above practices constitutes a violation of Title VII of the Civil Rights Act of 1964

and cannot be justified by business necessity.

39.    As a direct and proximate result of Defendant's unlawful employment practices as

described above, the Plaintiff suffered the indignity of discrimination, humiliation, mental

anguish, severe emotional distress and other tangible harm in terms of career enhancing

opportunities and incurred further consequential damages as a result of this conduct.

### FOR A FOURTH CAUSE OF ACTION
#### Title VII, 42 U.S.C. Section 2000 et seq. And 42 U.S.C. Section 1981a
#### ("DISPARATE TREATMENT")

40.    SSA Leighton ("Plaintiff") repeat and realleges the allegations contained in

paragraphs 1 - 28 inclusive as if they were set forth in here in full.

41.    As detailed herein, the Plaintiff has been subjected to various acts of disparate

treatment discrimination based on his race taken together and/or separately has affected his

ability to secure promotions or otherwise succeed as a Special Agent in the FBI. Such disparate

treatment cannot be justified by any legitimate business reason, bona fide occupational qualification or business necessity.

42.    Defendant's conduct as described above constitutes a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, as amended, and the Civil Rights Act of 1991, 42 U.S.C. Section 1981a.

43.    As a direct and proximate result of Defendant's unlawful employment practices as described above, the Plaintiff suffered the indignity of discrimination, humiliation, mental anguish, severe emotional distress, and further consequential damages as a result of this conduct.\

### FOR A FIFTH CAUSE OF ACTION
### Title VII, 42 U.S.C. Section 2000 et seq. and 42 U.S.C. Section 1981a
### ("RETALIATION")

44.    SSA Leighton ("Plaintiff") repeats and realleges the allegations contained in paragraphs 1 - 28 inclusive as if they were set forth in here in full.

45.    The plaintiff's made repeated attempts to redress these issues of unlawful discrimination with FBI management but suffered retaliation and reprisals from FBI management in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, as amended, and the Civil Rights Act of 1991, 42 U.S.C. Section 1981a.

46.    As a direct and proximate result of Defendant's unlawful employment practices as described above, Plaintiff suffered the indignity of discrimination, humiliation, mental anguish, severe emotional distress, other tangible harm in terms of promotion and other career enhancing opportunities and further consequential damages as a result of this conduct.

47.    **WHEREFORE**, the Plaintiff prays this Honorable Court:

(a)    to enter a declaratory judgement, finding that defendant's conduct as alleged herein

has violated the plaintiff's civil under 42 U.S.C. Section 2000e and 42 U.S.C. Section 1981a;

(b)    to enter a permanent injunction barring defendant from continuing to engage in the illegal discriminatory and retaliatory conduct alleged herein;

©    to enter a permanent injunction, directing defendant to such affirmative steps as necessary to remedy the effects, and prevent future occurrences of the illegal discriminatory and retaliatory conduct alleged herein;

(d)    to appoint a civil rights monitor to oversee and monitor compliance with Title VII and other civil rights laws of at FBIHQ;

(e)    to award compensatory damages according to proof up to $300,000 for the emotional distress and other harms as alleged herein;

(f)    to award back pay, front pay, restored leave and any other such damages as would compensate Plaintiff;

(g)    to enter appropriate equitable relief adjusting Plaintiff's records, SES-level and promotion potential to place Plaintiff in the same potential as Plaintiff would have been absent the illegal discriminatory and retaliatory practices;

(h)    to award reasonable attorneys' fees. Expert fees and other costs pursuant to 42 U.S.C. Section 1988 and 42 U.S.C. Section 2000e; and

(I)    to order other such relief as the Court may find just and proper to vindicate the rights of the plaintiffs.

Respectfully Submitted,

Donovan J. Leighton
Pro Se
11101 Georgia Avenue Apartment
Wheaton, Maryland 20902
(301) 933-0690

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable by right.

Respectfully submitted,

Donovan J. Leighton
Pro Se
11101 Georgia Avenue Apartment # 263
Wheaton, Maryland 20902
(301) 933-0690

Dated: September 13, 2005
      Wheaton, Maryland



**U.S. Department of Justice**

Complaint Adjudication Office

Agency Complaint No. F-03-5733
DJ Number 187-2-813

*Complaint Adjudication Office*
*Patrick Henry Building, Ste. 5300*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*          JUN   7  2005

Mr. Donovan Leighton
801 15th Street South, #1511
Arlington, VA 22202

Dear Mr. Leighton:

This is in reference to the complaint of discrimination that
you filed against the Federal Bureau of Investigation.  Under the
Department of Justice's equal employment opportunity regulations,
the Complaint Adjudication Officer renders the final Department
of Justice decision on your complaint.  The Department of Justice
finds that you were not subjected to discrimination based on
either race or reprisal.  Enclosed is the final Department of
Justice decision.

### Rights of Appeal

First, you have the right to appeal any part of this
decision to the Equal Employment Opportunity Commission (EEOC).
You may do so by filing your appeal within 30 days of the date
you receive this decision.  If you are represented by an attorney
of record, the 30-day appeal period shall begin to run the day
your attorney receives this decision.  The appeal must be in
writing.  The Commission prefers that you use EEOC Form 573,
Notice of Appeal/Petition, a copy of which is attached, to appeal
this decision.  The notice of appeal should be sent to the
Director, Office of Federal Operations, EEOC, Post Office Box
19848, Washington, D.C.  20036, by mail, personal delivery, or
facsimile.  You must also send a copy of your notice of appeal to
Veronica Venture, EEO Officer, Federal Bureau of Investigation,
10th and Pennsylvania Avenue, N.W., Room 7901, Washington, D.C.
20535.  You must state the date and method by which you sent the
copy of your notice to the agency's EEO Director either on, or
attached to, the notice of appeal you mail to the EEOC.

Second, you have the right to file a civil action in the
appropriate United States District Court within 90 days of the
date you receive this decision.  In filing your federal
complaint, you should name Attorney General Alberto Gonzales as
the defendant.  Even if you appeal this decision to the EEOC, you
still have the right to go to federal court.  You may file a

FILED
05 1835
SEP 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

- 2 -

civil action in the United States District Court within 90 days of the day you receive the Commission's final decision on your appeal, or after 180 days from the date you filed your appeal with the Commission, if the Commission has not made a final decision by that time.

If you cannot afford to file a civil action, you can ask the court to allow you to file the action at no cost to you. The court may also provide you with an attorney if you cannot afford to hire one to represent you in your civil action. Questions concerning when and how to file a waiver of costs should be directed to your attorney or the District Court clerk.

Sincerely,

Mark L. Gross
Complaint Adjudication Officer

cc:   Veronica Venture
      Theodius McBurrows