IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMANUEL JOHNSON, JR., et al.
on behalf of themselves and as
Representatives of a Class of all
Others Similarly Situated,

          Plaintiffs,

      v.

JANET RENO,

         Defendant.

Civ. No. 93-0206 TFH
Hon. Thomas F. Hogan

## SETTLEMENT AGREEMENT

EXHIBIT
C
CA 05-1835

# TABLE OF CONTENTS

INTRODUCTION ........................................... 1

I.  INTERIM RELIEF ...................................... 2

II. PROSPECTIVE RELIEF .................................. 2

    A.  Career Development Program ..................... 2

    B.  Principal Relief Supervisor Positions ......... 4

    C.  Senior Executive Service ...................... 6

    D.  Management Aptitude Program ................... 7

    E.  Training ...................................... 9

    F.  Specialty and Hardship Transfers ............. 12

    G.  Assignments to Resident Agencies ............. 13

    H.  Assignment to Non Top-15 Field Offices ....... 14

    I.  Performance Appraisals ....................... 14

    J.  Awards and Bonuses ........................... 16

    K.  Discipline ................................... 17

    L.  Special Teams ................................ 19

    M.  Personnel Files .............................. 20

III.  RETROACTIVE RELIEF                                           23

      A. Promotions and Lateral Transfers                         23

            1.  Promotions                                        23

                  a.  Selection Procedures                        23

                  b.  Backpay                                     25

            2.  Lateral Transfers                                 27

      B.  Performance Appraisal Reports                           30

      C.  Discipline                                              31

      D.  Principal Relief Supervisors                            33

      E.  Training                                                34

      F.  Resident Agency Assignments                             37

      G.  Squad Assignments                                       37

      H.  Special Teams                                           38

            1.  SWAT                                              38

            2.  TECH Teams                                        39

      I.  Awards and Bonuses                                      41

      J.  Transfers                                               42


IV. COMPLIANCE AND REVIEW PROVISIONS                              42


V.  MONITORING                                                    49

      A.  Compilation of Data                                     49

      B.  Substance of Data                                       49

      C.  Semi-Annual Review                                      50

      D.  Analysis of Data                                        51

      E.  Use of Documents and Statistical Reports               51

      F.  Costs of Monitoring                                     53

VI.   MISCELLANEOUS SECTIONS                                    53

    A.   Waiver of Equitable Exhaustion Defenses          53

    B.   Preservation and Expedition of EEO Claims        54

    C.   Schedule and Procedure for Approval              56

    D.   Effective Date and Term of Settlement Agreement  58

    E.   Procedures for Resolving Retaliation Claims      58

    F.   Enforcement                                      61

    G.   Construction                                     66

    H.   Collateral Use of the Agreement Prohibited       66

    I.   Attorneys' Fees and Expenses                     66

    J.   Counterparts                                     67

    K.   Entire Agreement                                 67

    L.   Non-Waiver                                       68

    M.   Headings                                         68

    N.   Extension of Time by Agreement of Parties        69

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

EMANUEL JOHNSON, et al.,            )
                                   )
            Plaintiffs,            )
                                   )
       v.                          )   No. _____
                                   )
                                   )
STUART M. GERSON, ACTING ATTORNEY  )
  GENERAL OF THE UNITED STATES,    )
                                   )
            Defendant.             )
_____)

SETTLEMENT AGREEMENT

INTRODUCTION

This Settlement Agreement (hereinafter the
"Agreement") is entered into between plaintiffs, as
individual class representatives, Morris A. Blueford,
Verne Dickerson, Cecily Graham, Sherry Davis, Ronald D.
Kemp, Leadell Lee, Joseph Cal Jackson, James McIntosh,
Alfred Johnson, Produs "Scott" M. Perkins, Nolan Doby,
Emanuel Johnson, Jr., Al Jordan, Prince Ross, Julian
Stackhaus, Johnnie Gibson, Tyrone Powers, Arthur
Grovner, Peter Reneau, Benjamin Russell, Donovan
Leighton, by their attorneys, on behalf of a putative
class of all Black Special Agents of the Federal Bureau
of Investigation, who have been employed by the Federal

1

Bureau of Investigation (FBI) at any time from March 5, 1991, until the effective date of this Agreement, and defendant, William Barr, Attorney General of the United States.

In the interest of resolving this action without the need for formal litigation, the parties hereby agree to the following terms on which this action will be fully and finally resolved.

I.   INTERIM RELIEF

The terms of the agreement which relate to interim relief are set forth in a letter from plaintiffs' counsel to the FBI, dated December 4, 1991, and the Statement of Work in contracts numbered J-FBI-92-017 and J-FBI-92-018.  Copies of these documents are attached as Appendix A and incorporated herein by reference.

II.   PROSPECTIVE RELIEF

A.   Career Development Program

1.   The FBI has retained an outside contractor to examine and recommend changes to the existing career development program (now known as the Executive Development and Selection Program (EDSP)). The contractor has been retained to provide the FBI with a validated process for selecting Special Agents

2

for GM-14 and GM-15 positions. The EDSP selection procedures will be developed in accordance with the Uniform Guidelines, any applicable federal laws or regulations, and generally accepted professional standards, as set forth in Appendix A, supra, and Part IV, infra (Compliance and Review Procedures), and will be designed to minimize, to the greatest extent possible, any adverse impact on any group protected under Title VII of the Civil Rights Act of 1964, as amended, the Rehabilitation Act of 1973 and the Age Discrimination in Employment Act of 1967.

    2.  For a period of two years after the effective date of this agreement, EDSP vacancy notices electronically posted in the Job Posting Application (JPA) will also be physically posted in a common area in each Field Office and FBIHQ Division on at least a weekly basis. It is the FBI's objective to make the notices of EDSP vacancies as widely available as possible during the FBI's transition from physical to electronic posting. At the end of this two year period, the FBI will evaluate the access to electronically posted information related to EDSP vacancies to determine whether the physical posting process described in this paragraph should be continued, with the goal of making such postings reasonably available to all Special Agents.

B. <u>Principal Relief Supervisor Positions</u>

1.  The FBI Policy Statement on "Equal Employment Opportunity and Federal Affirmative Employment Plans" will be modified in part as follows:

> The Director of the FBI strongly encourages women and minorities to participate in the voluntary CDP and supports initiatives to affirmatively recruit women and minorities into the CDP.  Increasing the number of women and minorities participating in the CDP at the entry level position of relief supervisor will broaden the pool of women and minority candidates eligible for selection as supervisors, mid-level managers and, ultimately, for selection as senior executives. It is the Director's objective to encourage participation in the CDP by sufficient numbers of highly talented and motivated women and minority SA's to ensure that women and minority SA's achieve leadership positions in the FBI, including the Senior Executive Service.

2.  The FBI will create a position on each squad of "secondary relief supervisor."  The secondary relief supervisory position, as well as the principal relief supervisory position, will be rotated on an annual basis among the qualified relief supervisors on the squad, consistent with the operational needs of the squad.  This rotation procedure may be delayed by the Special Agent in Charge (SAC) if warranted by business necessity.  It is the intention of the parties that the same persons not serve in the principal and secondary relief supervisory positions consistently over several

4

years unless no other qualified Special Agents volunteer to be considered for selection to that position. It is further the intent of the parties to maximize the opportunity for all qualified Special Agents to serve in principal and secondary relief supervisory positions.

3. Selection of the principal and secondary relief supervisors will be made from among relief supervisory applicants on the squad who supply a recommendation from his or her squad supervisor. The SAC may provide the Field Office career board with his or her views regarding the candidates for these positions, but the actual selection will be made by the Field Office career board. To the greatest extent possible, the selections will be based upon objective, job related criteria, and consistent with the FBI Policy Statement on "Equal Employment Opportunity and Federal Affirmative Employment Plans" set forth in Section II.B.1., supra. The FBI will require the contractor selected to review and modify the EDSP, as set forth in Section II.A., supra, to develop recommendations for these criteria.

4. The FBI will develop and implement standardized training for relief supervisors and will record the names of the Special Agents to whom such training is given. The FBI will develop this training

5

program within 12 months of the effective date of this
agreement, unless this period is extended by agreement
of the parties.

  5. The Office of Equal Employment
Opportunity Affairs (OEEOA) will review annually
statistical data regarding the assignment of Special
Agents to the principal and secondary relief
supervisory positions to determine if any adverse
impact develops and report these findings and
recommendations, if any, to the Director on an annual
basis.

  6. The FBI will eliminate the use of the
current relief supervisory rating forms for any purpose
and will instruct all Field Offices and Divisions that
any such forms or ratings present in personnel files
should be disregarded in promotional decisions.  No
further relief supervisor ratings shall be conducted
unless the process by which the ratings are made have
been validated beforehand pursuant to the Uniform
Guidelines, any applicable federal laws or regulations
and generally accepted professional standards.

  C. Senior Executive Service (SES)

  The FBI has agreed to modify the FBI Policy
Statement on "Equal Employment Opportunity and Federal
Affirmative Employment Plans" as set forth in paragraph
II.B.1., supra.

6

D.  Management Aptitude Program (MAP I and MAP
    II)

1.  The scores achieved by all Special
Agents who participate in the MAP I and MAP II will be
furnished only to the Special Agents to whom they
apply and will not be disclosed to a Special Agent's
supervisor or superiors, nor will they be used in
connection with any personnel decision unless the
process under which that score was obtained has been
validated.  This procedure will remain in effect until
MAP I and II have been validated pursuant to the
Uniform Guidelines, any applicable federal laws or
regulations, and generally accepted professional
standards, as set forth in II.D.3., infra. Nothing in
this section will prohibit the MAP I and II staff, or
other personnel who are responsible for administering
any part of the MAP program, from having access to the
MAP I and II scores as part of their official duties.

2.  The FBI may continue to require
attendance at MAP II as a prerequisite for selection
for the position of Assistant Special Agent in Charge
(ASAC), so long as the scores are neither revealed to
anyone other than the Special Agent (except MAP staff
or other personnel as set forth in the preceding
paragraph), nor used in connection with any personnel
decision, unless the particular process has been

7

validated beforehand pursuant to the Uniform
Guidelines, any applicable federal laws or regulations,
and generally accepted professional standards, as set
forth in II.D.3., _infra_.

      3.  The FBI will require the contractor
selected to examine and recommend changes to the EDSP
under Section II.A., _supra_, to recommend revisions to
MAP I and II, to the extent necessary, to validate them
pursuant to the Uniform Guidelines, any applicable
federal laws or regulations, and generally accepted
professional standards.

      4.  The FBI will require the contractor
selected under Section II.A., _supra_, to develop new MAP
exercises and procedures for the FBI's use to minimize
the possibility that candidates will learn the
substance of the exercises in advance of their
attendance at MAP.  The FBI will develop and enforce a
policy that participants in the MAP process will not
reveal the substance of exercises to candidates for MAP
except in a formal process by which the FBI may brief
its Special Agents about the nature of the MAP process.
The FBI will require the contractor selected pursuant
to II.A., _supra_, to formulate such a briefing
procedure.

      5.  The OEEOA will monitor statistical data
relating to the MAP programs, including the selection

of participants and assessors, ratings, and removal of
contingencies (if such a process continues to exist
under any modified program) to determine if any adverse
impact develops on at least an annual basis and report
annually their findings and recommendations, if any, to
the Director.

      6.  Selection to attend MAP I will be
assigned to the Special Agent Mid-Level Management
Selection (SAMMS) Board, or, if that Board is
eliminated or modified, such Board or panel that most
closely retains the functions of the SAMMS Board.  The
selection will be based upon recommendations from the
Field Office or FBI Headquarters Division Career Boards
and the Assessment Center staff.

      7.  Selection of candidates to attend MAP II
will also be assigned to the SAMMS Board, or, if that
Board is eliminated or modified, such Board or panel
that most closely retains the functions of the SAMMS
Board, from those Special Agent candidates who have the
necessary qualifications to attend MAP II.

      E.  Training

      1.  The FBI will create a database in the
Field Office Information Management System (FOIMS), or
other similar computer system, to permit the electronic
posting of all available in-service training
opportunities.  In addition, for a period of two years

after the effective date of this agreement, notices of
training opportunities electronically posted will also
be physically posted in a common area in each Field
Office and FBIHQ Division on at least a weekly basis.
It is the FBI's objective to make the notices of
training opportunities as widely available as possible
during the transition from physical to electronic
posting.  At the end of this two year period, the FBI
will evaluate the access to electronically posted
information related to training opportunities to
determine whether the physical posting process
described in this paragraph should be continued, with
the goal of making such postings reasonably available
to all Special Agents.

2.    Each Field Office and Headquarters
Division will make the database which contains in-
service training courses available to all Special
Agents.

3.    Special Agents who wish to attend an in-
service training course will submit their request in a
memorandum in the normal chain of command. The
supervisor of the Special Agent submitting the request
will addend the memorandum commenting on the
qualifications of the Special Agent and recommending
whether the Special Agent should be permitted to attend
the in-service training course.  The Special Agent will

10

then read and initial the addendum, with any comments
he or she wishes to make thereto, and the memoranda
will be used to establish lists in each Field Office or
Headquarters Division of candidates for each in-service
training course.  A copy of this memo will be
maintained in the employee's personnel file, and a copy
in a training file in such a manner that a computerized
database of applications and selections for in-service
training courses may be created.

    4.  Each Field Office or FBIHQ Division will
select for each in-service training course the best
qualified candidate available based, to the greatest
extent possible, upon objective criteria and maintain a
record of the reason for each selection.  The SAC or
Assistant Director will retain the final authority to
decide whether to nominate any Special Agent to attend
the in-service, whether to nominate another Special
Agent who volunteers, or to select a Special Agent who
did not volunteer.  Each Field Office and FBIHQ
Division will post, at least on a quarterly basis, a
list of selectees for in-service training.

    5.  The FBI will develop, within six months
of the effective date of this agreement, a list of
relevant factors to be used in making selections for
in-service training courses and provide counsel for the
plaintiffs a reasonable opportunity to comment thereon.

11

The final decision, however, as to such factors will be in the sole discretion of the Director consistent with federal law.

6. In some of the major metropolitan Field Offices, selections for certain designated in-service training courses will be made by the Field Office career board. The FBI will develop, within six months of the effective date of this agreement, a list of the Field Offices in which such selections will be made by the Field Office career board, and a list of the in-service training courses subject to career board selection and provide counsel for plaintiffs a reasonable opportunity to comment thereon. The final decision as to which Field Offices and which in-service training courses will be subject to the requirement of career board selection will be within the sole discretion of the Director.

F. <u>Specialty and Hardship Transfers</u>

1. Within six months of the effective date of this agreement, the FBI will develop and use, to the greatest extent possible, objective criteria for selecting Special Agents to receive specialty transfers. Counsel for plaintiffs will be provided an opportunity to comment on these criteria, but the final determination of criteria to be used in selecting

12

Special Agents to receive specialty transfers will be within the sole discretion of the Director.

2. The OEEOA will monitor statistical data related to specialty and hardship transfers to determine if any disparate impact develops and will report at least annually the results of its findings and recommendations, if any, to the Director.

G. <u>Assignments to Resident Agencies (RAs)</u>

1. Each Field Office will develop a preference list for assignment to RAs. Any request by a Special Agent for transfer to an RA will be made in writing and maintained in the Special Agent's personnel file, with a copy maintained at FBIHQ in a manner that could be subject to computer analysis. This list will be transmitted regularly to the OEEOA to be maintained in a computer-readable format.

2. Each <u>intra</u>-office <u>no cost</u> transfer to an RA will be based upon the recommendation of the Field Office career board to the SAC, with the final decision by the SAC. Any decision deviating from the preference list when filling a vacancy in a <u>no cost</u> RA will be documented by the SAC, and such deviation will be only for reasons consistent with business necessity.

3. In the event that a decision is made by the Special Agent Transfer Unit at FBIHQ and the SAC to fill a vacancy in an RA with an <u>intra-office cost</u>

13

transfer from that Field Office's personnel complement,
the selection will be made from the Field Office's
resident agency preference list in the same manner as
selection to intra-office no cost RAs as set forth in
the preceding paragraph supra.

   &#8212; H.  Assignment to Non Top-15 Field Offices

     1.  The FBI will automate the information
concerning requests for first-office assignments made
by Special Agents graduating from Quantico.  In
addition, the FBI will automate the information
concerning any requests for assignments that may be
voluntarily submitted by Special Agents for normal
rotational transfers.

     2.  The data maintained pursuant to this
section will be monitored by the OEEOA to determine if
any adverse impact develops and the OEEOA will report
their findings and recommendations, if any, to the
Director on at least an annual basis.  The data and
reports created and maintained pursuant to this section
will be made available to counsel for the plaintiffs in
the manner set forth in Section V., infra, exclusive of
any recommendations.

   I.  Performance Appraisals

     1.  The FBI agrees to retain an outside
expert consistent with normal procurement procedures to
assist in reviewing the existing Performance Appraisal

Rating (PAR) system and design a validated PAR system
pursuant to the Uniform Guidelines, any applicable
federal laws or regulations, and generally accepted
professional standards. The FBI will issue an RFP for
this work within six months of the effective date of
this agreement, consistent with the Compliance and
Review provisions set forth in Section IV., _infra_. The
FBI may retain an outside expert to assist in the
drafting of this RFP, and an expert selected by the
plaintiffs shall be permitted to review and comment
upon the proposed RFP prior to its issuance.

2. Additional training on performance
appraisal preparation, including cultural awareness
training, will be provided to all FBI personnel who
prepare PARs. As part of this training process, the
statistical data documenting the disparities in
performance appraisals will be discussed.

3. A program of enhanced feedback on
performance will be developed and provided to all
Special Agents during file reviews, in addition to
normal semi-annual performance reviews.

4. The OEEOA will review statistical data
regarding performance appraisals to determine if any
disparate impact develops and will annually report its
findings and recommendation, if any, to the Director.
Counsel for plaintiffs will be given access to this

data and reports, exclusive of any recommendations, in
accordance with the monitoring provisions set forth in
Section V., _infra_.

    J.  _Awards and Bonuses_

        1.  In order to raise awareness and insure
that the contributions of all Special Agents are fairly
rewarded, the FBI will send a written communication to
each SAC and Assistant Director advising that smaller
and fewer awards have been given to Black Special
Agents.  The SACs and Assistant Directors will
communicate this information to supervisory personnel
who have responsibility for participating in the
process of selecting recipients for awards and bonuses.

        2.  Within six months of the effective date
of this agreement, the FBI will develop and use, to the
greatest extent possible, objective standards to guide
supervisors in identifying candidates for receiving
awards.  These standards will be set forth in writing
and will be made available to all Special Agents.
Counsel for the plaintiffs will be provided an
opportunity to comment on these standards.  The FBI
will develop and use objective standards, to the
greatest extent possible, for multiple awards as set
forth in this paragraph, to help determine if multiple
awards in single cases are distributed fairly among all
Special Agents participating in the case.  In addition,

16

the FBI will collect and maintain data in an automated format regarding multiple awards granted in single cases.

3. The identity of recipients of awards and bonuses will be made public and incentive awards will continue to be presented in a public forum. However, the FBI will not be required to make public the amount of the awards.

4. The OEEOA will monitor future awards to determine if any disparate impact develops and will report annually its findings and recommendations, if any, to the Director. Counsel for plaintiffs will be given access to this data and reports, exclusive of any recommendations, in accordance with the monitoring provisions set forth in Section V., infra.

K. Discipline

1. The FBI will retain an expert, consistent with normal procurement procedures, to examine the way disciplinary proceedings are initiated. If necessary, the expert will be required to devise procedures to ensure, to the greatest extent possible, that disciplinary action will not be initiated against any group of employees at a statistically significantly higher rate than any other group of Special Agents, absent reasons consistent with business necessity. The FBI may, at its option, divide this work into two RFPs,

17

one to ascertain the cause of the disparity and a second to recommend changes to eliminate the disparity, if the FBI concludes that these two steps require different skills than any one expert may possess. The FBI will permit an expert for the plaintiffs to review and comment upon the proposed RFP(s) prior to issuance.

2. The FBI will institute a 180-day time limit on all disciplinary matters. This time limit will cover both the Office of Professional Responsibility (OPR) investigation and the adjudication process by the Administrative Summary Unit. The 180-day limit may be extended in any case only with the written approval of the Associate Deputy Director-- Administration and such extension will be reviewed every 30 days thereafter. All requests for initial or subsequent extensions shall state the justification for the request. It is the intent of the parties that such extensions will generally be limited to cases that are complex or delayed by collateral proceedings.

3. Any Special Agent who becomes a subject of an administrative inquiry will be notified in writing of his or her status as the subject of an inquiry within 30 days except when the Deputy Assistant Director (DAD)-OPR determines that such notification will jeopardize the investigation. The DAD-OPR will reconsider such determinations every 30 days and

18

notification to the affected Special Agent will be provided as soon as practicable.

4.  Those Special Agents who become the subject of administrative inquires which result in no disciplinary action being taken against them will be advised when the inquiry is concluded within 30 days of such conclusion.

L.  Special Teams

1.  The FBI will not permit the practice of voting for membership on SWAT[1] and HRT[2] teams by the existing team members.

2.  The selection of SWAT team members will be made by the Field Office career board with final approval by the SAC.

3.  Selection for membership on the HRT will be made by the FBIHQ SAMMS Board after consideration of the recommendation of the official in charge of the HRT.

4.  Within six months of the effective date of this agreement, the FBI will develop and use, to the greatest extent possible, objective criteria for selection to SWAT and HRT.  The FBI will provide

---

[1]  SWAT is an acronym for Special Weapons and Tactics.

[2]  HRT is an acronym for Hostage Rescue Team.

counsel for plaintiffs an opportunity to comment on these criteria.

　　　　5.　The FBI will not permit the practice of voting for membership on technically trained (TECH)[3] squads by the existing squad members.  Within six months of the effective date of this agreement, the FBI will develop and use, to the greatest extent possible, objective criteria for selection to TECH training and assignment to TECH squads.

　　　M.　Personnel Files

　　　　1.　The FBI has agreed to standardize the procedures for permitting FBI employees access to their official personnel files without the need of filing a Freedom of Information Act and Privacy Act (FOIA/PA) request.  The FBI will use its best efforts to make available for inspection within 15 days of a request, the employee's Field Office personnel file, and within 45 days, the employee's FBI Headquarters personnel file unless extraordinary circumstances are present.  For purposes of this section, extraordinary circumstances may include, among other factors, receipt by the FBI of a large number of requests in a short time or the unforeseeable lack of sufficient available resources at FBIHQ or in the Field Office to process these requests.

---

　　　[3]　TECH  is  an  acronym  for  Technical  and Sound/Wiretapping Training.

Certain confidential information, including the
background investigation, testing materials and other
very sensitive information may also need to be reviewed
and/or removed consistent with the Privacy Act of 1974
and classification regulations before access is
permitted.

2.    FBI employees will be provided an
opportunity to review and comment on documents placed
in their personnel files.  FBI employees will not be
permitted to remove documents from their personnel
files, but they will have the opportunity to submit for
filing, a response or rebuttal to any document in the
file.

3.    The FBI will develop, within six months
of the effective date of this agreement, procedures to
implement the provisions of this section.  These
procedures will be provided to counsel for plaintiffs
for comment and review prior to their implementation,
but the final decision on procedures to be adopted,
will be within the Director's sole discretion.

4.    The FBI will not maintain any file
regarding the performance of any employee for a period
longer than one year, except the official FBIHQ or
Field Office personnel files, provided that, if the
information is potentially relevant to a pending
complaint, charge or internal investigation, such

21

documents may be maintained until final resolution of the complaint, charge or investigation.

5. The FBI will make available to each employee, upon request, at the time the employee is provided his or her annual performance rating, access to the performance folder maintained by the employee's rating official to permit the employee to review the documentation upon which the rating is based. Information maintained in such folders which is relevant to a pending complaint, charge or internal investigation will not be made available to the employee pursuant to this section. If, after reviewing the performance folder, the employee disagrees with the rating afforded by the rating official, the employee will be required to follow all normal FBI procedures to appeal the rating.

6. The special access provisions set forth in this section do not eliminate the existing requirements that prior FBI authority be obtained before releasing information or documents in FBI files outside the FBI or submitting or disclosing such information or documents in any public forum, including but not limited to, any administrative or legal proceedings.

22

III.  RETROACTIVE RELIEF

    A.  Promotions & Lateral Transfers

        1.  Promotions

           a.  Selection Procedures

              (i)  The FBI will promote into GM-14 positions in the Criminal Investigative (Division 6), Intelligence (Division 5) and Inspection Divisions (Division 10) at FBIHQ, six Black GS-13 Special Agents: (A) who, prior to the effective date of this Agreement, but after March 5, 1989, applied for, but did not receive, a GM-14 promotion into one of these Divisions; and (B) each of whom meets the qualifications for the position into which each seeks a promotion, as set by the SAMMS Board in sub-section (iii), infra.  In no case will a class member receive more than one promotion as a result of promotions granted pursuant to this section.

              (ii)  Upon approval of the Court, three members of the class, who have been nominated by the class members, will comprise a panel that will compile a list of all class members who are interested and have represented that they meet the qualifications set out in sub-section (i), supra.  Members of the panel will be provided up to 5 days administrative leave and as many as three trips to Washington, D.C., to perform their duties as set forth in this paragraph.

The FBI will pay the travel and daily subsistence expenses incurred by the panel members in the performance of these duties in accordance with the Federal Travel Regulations (FTRs). The panel will forward to the SAMMS Board the list containing the names of the Black Special Agents who are interested and have represented that they meet such criteria, and will identify on such list the Division into which each Black Special Agent previously sought a position but was not selected. Each of the Black Special Agents nominated by the panel will be permitted to identify three general subject matter areas in the Division into which they seek promotion in which they would prefer to serve. If a class member is designated to sit on the panel, he or she will forfeit the opportunity to be considered for a promotion pursuant to this sub-section.

(iii) The SAMMS Board will recommend to the Director from such list six Black GS-13 Special Agents whom it determines are the most qualified for six GM-14 positions in Divisions 5, 6, or 10. In making its recommendations to the Director, the SAMMS Board may take into account all relevant job related criteria that it normally considers in making selections for promotion and will make every effort to place these Agents into one of the three areas for

24

which they have expressed an interest.

(iv)  The Director will approve the promotion of six Black Special Agents recommended by the SAMMS Board, absent reasons that are consistent with business necessity for not promoting one of those recommended.  If a Black Special Agent is selected for promotion pursuant to this section, but declines the position, he or she will lose all opportunity for promotion pursuant to this section.  If the six promotions are not filled by the first six candidates, either because the Director declines to promote one or more of the recommended candidates, or one or more of the recommended candidates declines the position, then the SAMMS Board will recommend to the Director additional qualified Black Special Agents from the panel's list of candidates, until there are no remaining qualified Black Special Agents on the list.

(v)  The selection process set forth in this section will be concluded within twelve months of the effective date of this Agreement, unless extended by agreement of the parties.

b.  Backpay

(i)  The FBI will pay to the class an amount which is deemed equivalent to the amount of retroactive compensation to which the Black Special Agents selected for promotions pursuant to this section

25

would have been entitled had they been selected for promotion on or after March 5, 1989, as set forth in the following paragraph, (ii). This payment will be made within sixty days of the completion of the selection procedures set forth in section III.A.1.a., supra.

(ii)  The six Black Special Agents selected for promotions pursuant to this section will not be given individual retroactive compensation, but will be placed in a grade commensurate with the salary he or she would have attained had they received a promotion for which they applied (in Divisions 5, 6, or 10) but were not selected.  The relevant time period for calculating the appropriate salary each Special Agent is to receive will be from the date the selection was made for the first position to which the Special Agent applied but did not receive the promotion. However, if the selection date of the position for which the Black Special Agent first applied preceded March 5, 1989, the Special Agent's salary will be calculated from the date of March 5, 1989.

(iii)  The class has decided, upon approval of the Court, to place the entire backpay amount paid pursuant to this section in an interest-bearing escrow account to cover expenses associated with monitoring of the Agreement pursuant to Section

26

V., infra.  The class has also decided that the Court

shall approve all disbursements made from this account.

2.  Lateral Transfers

a.  The FBI will laterally transfer into

the Criminal Investigative, Intelligence or Inspection

Divisions, nine Black GM-14 Special Agents, each of

whom:  (i) after March 5, 1989, applied for, but did

not receive, a promotion or lateral transfer into one

of these Divisions; (ii) does not currently hold, and

has never held, a GM-14 position in one of these

Divisions; and (iii) meets the current qualifications

for a GM-14 position in one of these Divisions.  A

minimum of two of the nine lateral transfers will be

onto the Inspection Staff in Division 10.  Each of the

Black Special Agents nominated by the panel will be

permitted to identify three general subject matter

areas in the Division into which they seek lateral

transfer in which they would prefer to serve.  In no

case will a class member receive more than one transfer

as a result of lateral transfers being granted pursuant

to this section.

b.  The panel created pursuant to

Section III.A.1.a.(ii), supra, will compile a list of

all class members who are interested and represent that

they meet the qualifications set out in the preceding

paragraph (a).  The members of the panel will be

27

provided two additional days of administrative leave,
if necessary, to perform their duties, as set forth in
this paragraph. The FBI will pay the travel and daily
subsistence expenses incurred by the panel members in
the performance of these duties in accordance with the
FTRs.  The panel will forward to the SAMMS Board the
list containing the names of the Black Special Agents
who are interested and have represented that they meet
such criteria, and will identify on such list the first
Division into which each Black Special Agent previously
sought a lateral transfer.  If a class member is
designated to sit on the panel, he or she will forfeit
the opportunity to be considered for a lateral transfer
pursuant to this sub-section.

        c.  The SAMMS Board will recommend to
the Director from such list nine Black Special Agents
that it determines are the most qualified for a lateral
transfer into GM-14 positions in Divisions 5, 6, or 10.
In making its recommendations to the Director, the
SAMMS Board may take into account all relevant job
related criteria that it normally considers in making
selections for lateral transfers into these Divisions
and will make every effort to place these Agents into
one of the three areas for which they have expressed an
interest.  The SAMMS Board will also recommend which

two of the nine Black Special Agents will be transferred to the Inspection Staff.

        d.  The Director will approve the lateral transfer of nine Black Special Agents recommended by the SAMMS Board to positions in Divisions 5, 6, or 10, absent reasons that are consistent with business necessity for not transferring one of those recommended. If a Black Special Agent is selected for lateral transfer pursuant to this section, but declines the position, he or she will lose all opportunity for lateral transfer pursuant to this section. If the nine lateral transfers are not filled by the first nine candidates either because the Director declines to transfer one or more of the recommended candidates, or one or more of the recommended candidates declines the position, then the SAMMS Board will recommend to the Director additional qualified Black Special Agents from the panel's list of candidates, until there are no remaining qualified Black Special Agents on the list.

        e.  The selection process set forth in this section will be concluded within twelve months of the effective date of this Agreement, unless extended by agreement of the parties.

B.  Performance Appraisal Reports (PARS)

1.  Until a validated PARs system is in place pursuant to Section II.I, supra, the FBI will grant each Special Agent, to the extent permitted by law and regulation, the option of having considered in any employment decision affecting the Special Agent either:  (a) the most recent performance appraisal rating of record, or (b) the three most recent performance appraisal ratings of record.  This procedure will remain in effect for a period of three years after the implementation of the new PARs system, supra.

2.  The FBI shall fully disclose in writing to all FBI PAR rating officials the statistical racial disparities in the PARs given to black and non-black Special Agents in most current PARS and PARS for the previous two years.

3.  The parties will analyze the most current PARs prepared for all Special Agents of the FBI to determine whether a statistically significant disparity exists on the basis of race.  If the parties determine that a statistically significant disparity continues to exist for Black Special Agents, the FBI will inform all participants in the PAR appeals process of such statistical disparity and such participants

30

will consider the statistical disparity in reviewing appeals of PARs by Black Special Agents.

C. Discipline

1. The FBI agrees that Field Office and FBIHQ Division Career Boards and the SAMMS Board will not have access to, nor consider, any record of any pending or past disciplinary action against any Special Agent in considering or ranking (if required) Special Agents for promotions, lateral transfers or any other positions, except as set forth in this section.

2. The FBI agrees that only after the SAMMS Board selects a candidate (selected candidate) or ranks the candidates (ranked candidates), a member of the SAMMS Board staff will determine whether the selected candidate or any ranked candidates have been the subject of any disciplinary action or investigation in the past 36 months. The SAMMS Board will forward such information to the Director at the time it forwards to the Director the name(s) of the selected candidate or ranked candidate(s).

3. If a selected candidate has a pending or past disciplinary action within the previous 36 months, the SAMMS Board will forward that Special Agent's name to the Director as the top-ranked candidate, however, the SAMMS Board will also select and forward the names

31

of two additional candidates from which the Director
may make the final selection.

4.  If a selected or ranked candidate is a
Black Special Agent who has been the subject of
disciplinary action within the previous 36 months, or
is at the time of selection by the SAMMS Board the
subject of an administrative inquiry, the Director will
consider in making his selection whether the pending
inquiry or past disciplinary action against such
candidate is in the class of disciplinary actions in
which a disparity is shown in the proportion of Black
Special Agents who were referred for consideration of
discipline.[4] An individual not associated with the
SAMMS Board will determine for the Director whether the
disciplinary action taken or pending against the
candidate arose from one or the areas in which
disparities in referrals for discipline have been
identified.  If the pending or past disciplinary action
is in the class of actions in which a disparity has
been shown, the Director may consider in making his
decision the fact that the discipline taken or pending
against the candidate was in the class of actions in
which disparities were identified.  The Director will

_____

[4]  The class of disciplinary actions for which a
racial disparity has been identified in terms of the
proportion of Black Special Agents referred for
consideration of discipline is located at Appendix B.

32

have the right to receive the advice of the SAMMS Board
on whether the particular discipline to which a Special
Agent has been subjected, or for which the Special
Agent is presently being investigated, will impact on
the Special Agent's ability to perform the duties of
the job for which the Special Agent has been selected
or ranked.  The Director may reject any candidate who
he concludes will be unable to perform effectively in
the position for which he or she has been selected or
ranked.

D.  Principal Relief Supervisors

1.  The FBI agrees to place within six
months of the effective date of this agreement,
thirteen Black Special Agents, each of whom has served
as a relief supervisor for at least two years, in
vacant or new Principal Relief Supervisor (PRS)
positions in their respective Field Offices.

2.  Upon approval by the Court, three
members of the class will comprise an additional panel
to compile a list of all class members who:  (a) are
interested in a PRS position; (b) have served as a
relief supervisor for at least two years; and (c)
represent that they meet the qualifications for a PRS
position.  The members of the panel will be provided
two days of administrative leave, if necessary, to
perform their duties as set forth in this section.  The

33

FBI will pay the travel and daily subsistence expenses incurred by the panel members in the performance of these duties in accordance with the FTRs.  The panel will forward the list of candidates who satisfy the requirements set forth above to the SAMMS Board which will, in turn, forward the names of the Black Special Agents to the respective Field Office Career Board.  If a class member is designated to sit on the panel, he or she will forfeit the opportunity to be considered for a PRS position pursuant to this section.

3.  The respective Field Office Career Boards will select the most qualified Black Special Agents for a PRS position from the list of qualified candidates submitted by the panel.  The FBI has the right to reject a particular Black Special Agent on this list if there are reason(s) that are consistent with business necessity for such rejection, but will inform the Special Agent in writing of the reasons he or she was not selected.

4.  The Special Agents selected pursuant to this procedure shall be subject to the same procedures created by Section II.B., _supra_.

E.  _Training_

1.  The FBI agrees to place, as expeditiously as possible, fifteen Black Special Agents in an in-service training course of their choice from

34

those listed in the current Advanced Professional
Training Catalog, or any course that has become
available at the time the panel compiles its list of
eligible candidates pursuant to the following
paragraph, so long as each Black Special Agent meets
the qualifications for the training course into which
he or she seeks admittance. The FBI agrees to expand,
if possible, the size or number of training courses in
order to include such Black Special Agents; however,
the FBI will not be required to replace or remove any
other Special Agent(s) already selected for a training
course in order to accommodate any Black Special Agent
granted admittance to such course pursuant to this
paragraph.

2.  The panel created pursuant to Section
III.D., supra, will compile a list of all class members
who are interested in receiving in-service training and
represent that they meet the qualifications for the
respective training course. The members of this panel
will be provided five days of administrative leave and
three trips to Washington, D.C., if necessary, to
perform their duties as set forth in this section. The
FBI will pay the travel and daily subsistence expenses
incurred by the panel members in the performance of
these duties in accordance with the FTRs. The panel
will forward to the FBI Training Division the list

35

containing the names of the Black Special Agents who are interested and represent that they meet such criteria, and will identify on such list the training course into which each such Black Special Agent seeks admission and each such Black Special Agent's stated qualifications for such course. Those class members who are designated to sit on the panel will forfeit the opportunity to be considered for a training course pursuant to this section.

3. In the event the Training Division determines that a Black Special Agent on the list is not qualified for the course selected, the Training Division will so advise the panel and the panel will thereafter permit the selected Black Special Agent to designate another in-service training course, or the panel may select another Black Special Agent from the list.

4. The FBI will not be required to place in any single session of a training course more than five Black Special Agents. In the event that more than five Black Special Agents express an interest in a single training course, the FBI will make an effort to accommodate their expressed interests pursuant to the provisions of this section.

5. The procedures set forth in this section shall be completed within six months of the effective

36

date of this agreement, unless extended by agreement of the parties.

F.  Resident Agency (RA) Assignments

The FBI will place forty-three Black Special Agents in RAs in the following manner:  (1)  within 12 months of the effective date of this agreement, fifteen Black Special Agents will be granted priority consideration for fifteen no-cost transfers from a major metropolitan Field Office to an intra-divisional, no-cost RA; and (2) the FBI will place twenty-eight additional Black Special Agents in those RAs referred to above or other RAs through normal rotational or Office of Preference (OP) transfers in accordance with applicable FBI rules, policies and regulations, and will use its best efforts to place these twenty-eight Black Special Agents in an RA within three years of the effective date of this Agreement, unless extended by agreement of the parties.

G.  Squad Assignments

Within 90 days of the effective date of this agreement, unless extended by agreement of the parties, the FBI will reduce to writing squad assignment rules for each Field Office that currently has such rules and uniformly enforces those rules, particularly regarding the assignment of Special Agents to applicant squads. The FBI agrees that any Special Agent who has been

37

assigned to an applicant squad for a time period longer than required under the written policy for that Field Office will be reassigned to a non-applicant squad, based on the needs of the Field Office and available vacancies.

H. <u>Special Teams</u>

1. <u>SWAT</u>

a. The FBI agrees to: (1) assign five Black Special Agents from secondary SWAT teams to primary teams, as vacancies occur; and (2) grant priority consideration to five Black Special Agents for placement in SWAT training programs. If there are not five black Special Agents on secondary SWAT teams that would be eligible to receive preferential placement on primary SWAT teams or a total of five Black Special Agents do not desire to be placed on the primary SWAT team, a corresponding number of additional SWAT training positions will be given to Black Special Agents.

b. The FBI will not be required to eliminate or replace other Special Agents in a SWAT training program to accommodate the Black Special Agents selected for training pursuant to this sub-section. The FBI may, however, increase the number of SWAT training positions available in order to include such Black Special Agents to accommodate this increase.

38

c.   The same panel established in Section III.E.2. (Training), _supra_, will compile a list of all class members who are interested in SWAT training and represent that they meet the qualifications for such training.  The panel will forward to the FBI Training Division the list containing the names of the Black Special Agents who are interested and represent that they meet the qualifications for this training.  Those class members who are designated to sit on the panel will forfeit the opportunity to be considered for a SWAT training course pursuant to this section.

d.   The Training Division will select from such list five Black Special Agents that it determines are the most qualified for vacancies in the SWAT training program.  The Training Division may take into account any job related criteria that it normally considers in making selections for SWAT training.

e.   The FBI and class members agree that successful completion of a SWAT training program does not guarantee that any Black Special Agent will be placed on a primary SWAT team in the Black Special Agent's Field Office.

2.   TECH Teams

a.   The FBI agrees to grant priority consideration to twenty Black Special Agents in

39

technical service training programs within three years of the effective date of this agreement, unless extended by agreement of the parties.

b.  The FBI will not be required to eliminate or replace other Special Agents in a technical service training program to accommodate the Black Special Agents selected for technical service training pursuant to this section. The FBI may, however, increase the number of training positions available in order to accommodate this increase.

c.  The same panel established in Section III.E.2. (Training), supra, will compile a list of all class members who are interested in technical services training and represent that they meet the qualifications for this specialized training.  The panel will forward to the FBI's Technical Services Division the list containing the names of the Black Special Agents who are interested and represent that they meet the qualifications for this specialized training.  Those class members who are designated to sit on the panel will forfeit the opportunity to be considered for technical services training pursuant to this section.

d.  The Technical Services Division will select from such list twenty Black Special Agents that it determines are the most qualified for vacancies in

40

the technical services training program.  The Technical
Services Division may take into account any job related
criteria, including any technical or educational
background, that it normally considers in making
selections for such technical training positions.

e.  The FBI and class members agree that
successful completion of a technical services training
program does not guarantee that any Black Special Agent
will be placed on a Tech team in those Field Offices
that have such teams.

I.  Awards & Bonuses

1.  The FBI shall pay to the class the sum
of $11,989.00, which amount is equivalent to the
disparity in the dollar amount of each type of award
and bonus (excluding amounts for Quality Step Increases
(QSI) and incentive awards for principal reliefs) paid
to Black Special Agents in comparison to non-black
Special Agents.

2.  The class has decided, upon approval of
the Court, to place the entire amount received pursuant
to this section in an interest-bearing escrow account
to cover expenses associated with monitoring of the
Agreement pursuant to Section V., infra.  The class has
also decided that the Court shall approve all
disbursements made from this account.

41

J.  Transfers

1.  The FBI shall use its best efforts to
expedite pending and future Equal Employment
Opportunity (EEO) claims regarding denials of OP
transfers, specialty transfers and hardship transfers
to black Special Agents.

2.  The officials in the OEEOA responsible
for processing such claims may use any of the
statistical data prepared by the parties reflecting
racial disparities in the FBI's transfer policies.


IV.  COMPLIANCE AND REVIEW PROVISIONS

A.  As set forth in Section II., supra, the FBI
has agreed in connection with this settlement to retain
expert(s) to study and make recommendations with
respect to the Career Development Program (CDP),
Performance Appraisal Report System, MAP I and II, and
initiation of disciplinary proceedings.  The FBI will
require that all work performed by those expert(s) be
in accordance with the Uniform Guidelines, any
applicable federal laws or regulations, and generally
accepted professional standards.  The FBI will
carefully review and consider the recommendations and
proposals submitted by the expert(s) retained for these
purposes, but will not be bound by or otherwise
required to adopt any recommendations or proposals

42

submitted by such expert(s). The work of such
expert(s) and implementation of any changes in
personnel practices deemed appropriate by the FBI will
be completed as expeditiously as practicable, and all
necessary efforts will be made to complete this process
within 24 months from receipt of the experts'
recommendations and proposals. If, due to unforeseen
circumstances, the process cannot be completed within
this time, counsel for the FBI will advise counsel for
the plaintiffs with respect to an appropriate schedule
for completion. However, the FBI will use its best
efforts to complete the work by the earliest
practicable date.

B.  A three member Review Committee (hereinafter
"the Committee") will be established to monitor and
comment upon the proposals and recommendations of the
aforementioned experts. The Committee will consist of
a member designated by the plaintiffs, a member
selected by the FBI, and a third Committee member to be
selected by the two aforementioned Committee members.

C.  The FBI will be responsible for paying the
fees and expenses of each of the three members of the
Committee, who will be paid his/her normal billing rate
for government contracts in effect when the services
are rendered. The FBI will pay the billed amounts as

43

expeditiously as possible upon the receipt of statements from the Committee members.

D.   The Committee will conduct its review in accordance with the Uniform Guidelines, any applicable federal laws or regulations, and generally accepted professional standards as agreed upon by the Committee members.  The Committee will review the following documents, and provide comments or recommendations as the Committee deems appropriate in light of the Uniform Guidelines, any applicable federal laws or regulations, and generally accepted professional standards, practices and principles, as well as the purposes for which the expert(s) is (are) being retained:

1.   Those items contained in any Request for Proposals (RFP) prepared by the FBI or other instructions given to experts required to be retained pursuant to this agreement to perform the work identified in paragraph IV.A. above, that are part of the technical requirements and evaluation criteria of the contract, specifically the:  statement of work, technical requirements, task orders, and evaluation factors for award (including the evaluation criteria and evaluation plan);

2.   The technical proposals submitted to the FBI in response to the RFP described in the preceding

44

paragraph, to determine if the technical proposals are technically responsive to the RFP;

3.   Any task orders prepared by the FBI and the corresponding response/proposals submitted by the expert;

4.   Any interim reports that may be produced by the expert as required by the contract; and

5.   Any deliverable/final report that may be produced by the expert as required by the contract.

E.   In addition to the documents identified in paragraph IV.D., supra, the FBI and the expert(s) if authorized by the FBI, will provide to the Committee any information, documents, or materials used by the expert(s) in performing their work that any member of the Committee may request. Requests for such information will be made in writing to counsel for the FBI or its designate. Any request by a member of the Committee for additional information will be communicated to the other members of the Committee, and any information that is provided in response thereto will also be provided to the other Committee members. If any such request is refused by the FBI, the reasons for such refusal will be provided in writing to the Committee.

F.   Each member of the Committee will be afforded the same opportunities for access to

45

information, to employees of the FBI, to the expert(s), and to data. There will be no meetings or conferences between the expert(s) and any member(s) of the Committee from which any other member(s) of the Committee is/are excluded. There will be no meetings or conferences between the FBI or representatives of the plaintiffs and any member of the Committee from which any other member is excluded, except that counsel for the FBI and the plaintiffs, respectively, may confer privately with their own designees to the Committee, who may disclose to counsel information learned during the course of their duties. No member of the plaintiff class will have any direct contact with the experts retained by the FBI except as required by their official FBI duties. No attorney representing the class shall have any direct contact with the experts retained by the FBI.

G.  Upon the FBI's receipt of the documents and materials from the experts identified in paragraph IV.D., supra, each member of the Committee will review same and make written comments and recommendations and provide them to the other Committee members. The Committee, in its discretion, will decide whether to meet personally to discuss the material. Where possible, all three Committee members will be

46

present for meetings and telephone conferences to discuss matters under review.

H.   The Committee members will consult in such manner as the Committee deems appropriate, and seek to arrive at a unanimous conclusion concerning the Committee's comments and recommendations for the particular matter under review.  If a unanimous position cannot be reached on a particular matter, the Committee will prepare a majority opinion including the reasons for its decision.  A minority statement may also be prepared and attached to the majority opinion setting forth the reasons for disagreement.  The Committee's conclusions will be communicated to counsel for the FBI and counsel for the plaintiffs within fourteen days of the Committee's receipt of the documents and materials to be reviewed.  Such period may be extended if the Committee for good cause requests additional time and counsel for the FBI and the plaintiffs agree to such request.

I.   The FBI will not be under any obligation to abide by or adopt any recommendation(s) or comment(s) of the Committee or its members.  If the FBI rejects any of the recommendations of the unanimous Committee or a majority opinion, the FBI will, within 90 days of being provided with the Committee's recommendations, provide the Committee with a written statement of the

47

reason for that decision. No expert(s) will be
obligated to abide by or adopt any recommendation of
the Committee or its members, unless so directed by the
FBI. However, should the FBI reject the recommendation
of the Committee, it will, within twelve months of the
decision to reject such recommendations, adopt policies
and procedures relating to the practice or procedure at
issue which comply with the Uniform Guidelines. This
twelve month period may be extended to eighteen months
if the FBI deems it necessary to secure a new
contractor in order to comply with the terms of this
section. But in any event, the FBI will comply with
this section prior to the expiration of this agreement.
If plaintiffs believe that the FBI has not complied
with this paragraph, plaintiffs or their
representative(s) will present such concerns in
accordance with the procedure set forth in Section
VI.G., _infra_.

    J. Each member of the Committee must sign a
Procurement Integrity Act Certification form and any
other nondisclosure agreements that may be required by
Federal law or regulation, as determined to be
necessary by the Department of Justice, or by agreement
of the parties to this agreement.

V.  MONITORING

    A.  Compilation of Data

        During the period of this Settlement Agreement, the FBI will maintain and regularly update a computer data base or data bases that contain data in each of the FBI's personnel systems covered by this Agreement in sufficient detail and layout to allow the parties to determine whether the provisions of this Agreement are being complied with and to determine whether any of the employment practices or personnel systems at issue may have a disparate impact upon any group of employees. The FBI will meet with representatives of the plaintiffs to seek a mutually acceptable file layout and content.

    B.  Substance of Data

        The data to be collected and maintained will include the following areas:

        1.  Promotions

        2.  Performance Appraisals

        3.  Principal Relief Supervisory Selections

        4.  Field Office Assignments

        5.  FBIHQ Division Assignments

        6.  Squad Assignments

        7.  Case Assignments

        8.  Awards & Bonuses

        9.  Disciplinary Actions

49

10. Hardship Transfers

11. Office of Preference Transfers

12. Applications and selections for In-service Training Courses

13. MAP I and II

14. Special Teams Selections

The FBI will provide counsel for the plaintiffs, within three months after the effective date of this Agreement, unless extended by agreement of the parties, a list of all data bases to be maintained pursuant to this Agreement. The FBI will also provide within three months of the creation of these data bases, unless extended by agreement of the parties, a detailed list of each field contained within each data base; the file layout of each data base and a data dictionary that defines the possible values for and source of each variable within each data base.

C. Semi-annual Review

Within eighteen months after the effective date of this Agreement and every six months thereafter until five years from the effective date of this Agreement, the FBI will supply to counsel for the class and their designated expert, reasonable access to the raw data necessary to satisfy the purpose of this monitoring provision, in computer readable form, from each data

50

base as listed in Section V.B., supra. The data will be subject to all customary Document Classification procedures in use at the FBI and to any other restrictions contained herein.

D.  Analysis of Data

Within eighteen months of the effective date of this Agreement and every six months thereafter until the end of five years, the FBI will analyze the employment data maintained in accordance with this Agreement to determine whether the employment practices or personnel systems at issue have had an adverse impact upon any group of employees during the previous data gathering period as well as cumulatively from the date this Agreement was entered.

E.  Use of Documents and Statistical Reports

1. The parties will exchange copies of any statistical reports based on their respective analyses of the data within a reasonable period after completion. Neither party will be required to release any recommendations in reports exchanged pursuant to this Agreement. The reports prepared by each party will remain the property of the party that prepared them, along with any copies thereof, and will be returned to the party that prepared them at the completion of the monitoring period under this Agreement.

51

2.  By letter dated September 6, 1991, the
parties entered into an agreement pursuant to Rule 408
of the Federal Rules of Civil Procedure which govern
the use of documents and statistical reports exchanged
between the parties during the negotiation period
leading up to this Settlement Agreement.  This letter
agreement is attached as Appendix C and hereby
incorporated by reference and its terms are to be given
full force and effect.

3.  In addition to the letter agreement
dated September 6, 1991, the plaintiffs and their
counsel have also agreed that all FBI documents, raw
data, statistical reports, or other information to
which they have been given access pursuant to this
settlement agreement remain the property of the FBI and
will be returned to the FBI upon the expiration of this
agreement.  Furthermore, these documents, data,
reports, or other information have been provided to
plaintiffs and their counsel for use in negotiating and
resolving their class-wide claims of discrimination and
cannot be used by the plaintiffs or their counsel in
any other negotiations, administrative action or
complaint, personnel action, legal proceeding, or for
any other purpose without written authorization from
the FBI and DOJ.

52

4. All legal privileges available to either party concerning these documents, data, reports, or other information provided to the plaintiffs and their counsel, including but not limited to, the attorney-client and attorney-work product privileges, will remain in full force and effect throughout the period of this agreement and either party may assert said defenses, including Rule 408, in any legal or administrative proceedings.

5. The provisions of this section cover all documents, data, reports, or other information provided to or created from such information by the plaintiffs or their counsel, either prior to the effective date of this agreement, or provided during the period of time covered by this agreement.

F. Costs of Monitoring

The FBI agrees that it will provide plaintiffs with access to the above data without charge. The parties agree that they will bear their own costs related to the analysis of the data.

VI. MISCELLANEOUS SECTIONS

A. Waiver of Equitable Exhaustion Defenses

1. The parties have negotiated this agreement beginning in April, 1991. The parties entered into a Waiver and Tolling Agreement in order to

53

waive any applicable EEO filing or administrative deadlines for all Title VII claims that have been filed, or could be filed, by any Black Special Agent from April 5, 1991, through the effective date of this Agreement. A copy of this Waiver and Tolling Agreement is attached as Appendix D and incorporated herein by reference.

2. For purposes of settlement, the FBI agrees to regard the negotiations that have transpired between the parties since April 5, 1991, and the class counseling initiated by plaintiffs on September 21, 1992, as satisfaction of the applicable requirements to file an administrative class complaint prior to the initiation of this action as set forth at 29 C.F.R. §1614 and 42 U.S.C. §2000e-16(c). In the event this Settlement Agreement is not finally approved by the Court, the FBI does not waive any defenses to the maintenance of an administrative (or civil) class complaint.

B.  Preservation and Expedition of EEO Claims

1. Any Black Special Agent who seeks to allege an individual claim of race discrimination, which arose between March 5, 1991, and the effective date of this agreement, may initiate such a claim for a period of 45 days after the effective date of this agreement in accordance with the provisions of

54

29 C.F.R. §1614 and 42 U.S.C. §2000e-16, provided that, if the claim involves an area for which retroactive relief was granted pursuant to Section III of this agreement, it may not be based on a disparate impact theory of recovery.

2. Any Black Special Agent who is granted some form of retroactive relief pursuant to this agreement and has filed an administrative (or civil) complaint of discrimination prior to the effective date of this agreement, will be required to withdraw or dismiss all claims in the administrative (or civil) complaint that could have resulted in the same or similar relief.

3. The FBI will use its best efforts to expedite all such EEO claims filed by the Black Special Agents with the OEEOA.

4. The officials and personnel in the OEEOA responsible for processing such claims may use in their review any data, whether prepared by the FBI or plaintiffs, reflecting any racial disparity in the FBI's personnel practices or policies.

5. Except as provided in the preceding two sub-sections VI.A. and VI.B., nothing in this agreement shall be taken as modifying either the statutory or regulatory procedures pertaining to initiating and maintaining administrative and judicial proceedings

55

under Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. §2000e-16 et seq., or the federal
civil service laws, or the requirement to exhaust
administrative remedies prior to initiating suit under
those statutes.

    C.   Schedule and Procedure for Approval

       1.  Subject to approval by the Court, the
parties hereby agree to the following procedure and
schedule for notice and submission of this Settlement
Agreement to the Court for approval pursuant to
Rule 23(e) of the Federal Rules of Civil Procedure.

       2.  At the time this Settlement Agreement is
submitted to the Court, the parties each agree to
recommend to the Court that it is fair, within the
meaning of that term contemplated by Rule 23(e) of the
Federal Rules of Civil Procedure.  Counsel for the
parties will request prompt judicial approval of this
Agreement.

       3.  Within 30 days of the date on which this
Settlement Agreement is presented to the court, the FBI
shall arrange for service of a notice of settlement and
summary of the Settlement Agreement upon each Special
Agent who has been employed by the FBI at any time
since March 5, 1991.  A full copy of the Settlement
Agreement shall be available in each Field Office,
Resident Agency, Legat, and Headquarters Division and

Office of the FBI.  Service shall be accomplished, at the election of the FBI, either by hand or by registered mail, return receipt requested.

4.  The parties agree to request that the Court schedule a hearing to determine whether this Settlement Agreement is fair ("fairness hearing") as required by Rule 23(e) of the Federal Rules of Civil Procedure at the earliest practicable time, but not sooner than 90 days after the date upon which the Settlement Agreement is filed.

5.  The parties agree to request an order of the Court that any person who wishes to raise an objection to this Agreement shall, at least 30 days prior to any fairness hearing that is scheduled by the Court, submit a written statement to the United States District Court for the District of Columbia, c/o the Clerk of the Court, U.S. Courthouse, 3rd and Constitution Avenue, N.W., Washington, D.C., and shall serve copies on counsel for the parties.  The statement shall contain the individual's name, address, and telephone number, along with a statement of his or her objections(s) to the Agreement and the reason(s) for the objection(s).

57

D. <u>Effective Date and Term of Settlement</u>

<u>Agreement</u>

1.  This Settlement Agreement shall take effect upon final approval by the Court following the fairness hearing referenced in Section VI.C., <u>supra</u>. Within ten days after the Court has granted final approval of this Agreement, the FBI shall post a final notice of settlement of class action claims in each Field Office, Resident Agency, Legat, Headquarters Division and Office of the FBI.

2.  Except as set forth in paragraph III.B., <u>supra,</u> this Settlement Agreement and all provisions thereof will expire and shall be without force and effect five years from the effective date of this Agreement.  This time limitation applies without exception, regardless of whether any particular paragraph of the Agreement expressly limits the provisions to the duration of the Agreement.  This Settlement Agreement will not be extended or modified without the written consent of the parties.

E.  <u>Procedures for Resolving Retaliation Claims</u>

1.  The parties agree that class members who claim they have been the victims of retaliation because of their assistance or participation in the pursuit of this action or the negotiations to resolve this action may pursue one of the two following procedures to

58

obtain impartial consideration and disposition of such claims:

      a.  The aggrieved employee may file an administrative complaint of discrimination pursuant to the regulations set out in 29 CFR §1614.105 et seq.; or,

      b.  The aggrieved employee may notify the OEEOA of the FBI that such retaliation has occurred and of their intention to seek the intervention of the court in which the suit was originally filed. No such complaint shall be raised with the court until 90 days after the OEEOA is notified of the employee's complaint. The employee and the FBI will be required to attempt an informal resolution of the complaint. If, after 10 days, no resolution is achieved, the FBI will conduct a full investigation of the facts and circumstances of the employee's complaint. The investigation will be completed in 60 days. At the conclusion of the investigation, the FBI will provide a copy of the results of the investigation to the aggrieved employee. The FBI and the employee will again be required to attempt to resolve the complaint informally. If, after 20 days, the FBI and the employee have failed to resolve the complaint informally, the employee may seek an order for

corrective action from the court in which the suit was originally filed.

2. In order to proceed under the provisions of paragraph 1, complaints of retaliation arising from assistance or participation in the pursuit of this action or the negotiations to resolve this action which accrued between March 5, 1991, and the effective date of this agreement must be brought to the attention of the OEEOA within 45 days of the effective date of this Agreement, in accordance with the provisions of 29 C.F.R. §1614 and 42 U.S.C. §2000e-16. Similarly, complaints of retaliation which arise after the effective date of this agreement must be brought to the attention of the OEEOA within the period provided by law.

3. Claims of discrimination or retaliation not arising from assistance or participation in the pursuit of this action or the negotiations to resolve this action may not be raised in the District Court without complying with the procedures set out at 29 C.F.R. §1614, nor may they be joined with claims raised with the Court in accordance with the procedures set out in paragraph 1 above.

60

F.  Underline Enforcement

1.  The parties agree that enforcement of
the terms of this agreement may only be obtained in the
following manner:

a.  Nonmaterial or nonwillful breaches
of the agreement may only be addressed in a separate
civil action in an appropriate forum;

b.  Material and willful breaches of the
terms of the agreement will be addressed through a
mandatory alternative dispute resolution (ADR) process
prior to seeking judicial relief.

2.  The ADR process will be comprised of
three phases, as necessary, to resolve the dispute:
Informal discussions between the parties, mediation by
a three member panel, and issuance of findings and
recommendations by the panel.  The parties agree that
the ADR process shall be conducted confidentially and
no public disclosure may be made relating to the
process until the conclusion of the 21 days specified
in paragraph 10 of this section.

3.  Within thirty days after the Effective
Date of the Agreement, the parties will each select a
primary and alternate member to serve on a mediation
panel.  The primary members will, in turn, select a
primary and alternate member to serve as the third
member of the panel.

61

4. The party complaining of a willful material breach (the "Complaining Party") shall notify the alleged breaching party (the "Respondent") of its intent to invoke the ADR procedure in writing and set forth what terms of the Agreement it believes to have been breached and the manner in which the Respondent has breached the Agreement (the "Notice"). A copy of the Notice shall be sent to the mediators and the parties shall determine the availability of the members of the panel.

5. For 21 days after service of the Notice, the parties shall meet and discuss the alleged breach and attempt to resolve the dispute (the "Initial 21 day period").

6. If, after the Initial 21 day period, the parties are unable to resolve the matter, the Complaining Party may notify the mediators as to which, if any, items in the Notice are unresolved (the "Notice of Unresolved Issues").

7. For 21 days after service of the Notice of Unresolved Issues the mediators shall conduct such proceedings as they deem proper to mediate the dispute (the "Second 21 day period").

8. The parties shall have 10 days following the expiration of the Second 21 day period to file with

the mediators written materials in support of their
positions. (the "Submission Period").

9. The panel shall have 30 days after the
expiration of the Submission Period to issue written
findings and recommendations and a report in support of
those findings (the "Findings"). During this 30 day
period the panel may conduct such proceedings as it
deems appropriate, e.g., oral presentations or
additional mediation between the parties. The panel
shall have access to pre-existing documents and other
information which are reasonably available.

10. Upon the issuance of the Findings, the
Respondent shall have 21 days to notify the Complaining
Party of its decision to accept or reject, in whole or
in part, any adverse findings or recommendations.

11. To the extent the Respondent rejects
any finding or recommendation, the Complaining Party
may seek relief in the United States District Court in
which the suit was originally filed.

12. To the extent the Complaining Party is
unsuccessful in securing a decision in its favor from
the panel, the Complaining Party may seek relief in the
United States District Court in which the suit was
originally filed. The Complaining Party will give
Respondent 10 days notice of its intent to proceed
under this paragraph. In seeking relief pursuant to

63

this paragraph, the Complaining Party may not request preliminary equitable relief, such as a temporary restraining order or a preliminary injunction. The Complaining Party will be limited to seeking an order for compliance from the court and may not seek a finding of contempt in the first instance.

13. If the Respondent accepts a finding or recommendation of the panel, but later fails to comply with that finding or recommendation within the time period specified by the panel's decision or, in the absence of a specified time, within a reasonable period, the Complaining Party may seek relief in the United States District Court in which the suit was originally filed. The Complaining Party will give the Respondent 10 days notice of its intent to proceed under this paragraph.

14. The Findings of the panel shall be admissible in any subsequent proceeding.

15. Each party shall pay 1/2 of the costs of the ADR; however, if the panel's findings and recommendations are accepted by the Respondent or, if not accepted by the Respondent and the Complaining Party is successful in enforcing the Agreement in the United States District Court, plaintiffs' counsel shall be entitled to attorneys fees and costs on the same terms and conditions as would be available to a

64

prevailing party under Title VII, 42 U.S.C. §2000e-5(k).

16.  If the panel fails to render a decision at the end of the period required by paragraph 9, the joint decision of any two of the mediators shall be considered the decision of the panel.  In the event that no two mediators render a decision within this period, the parties shall jointly request that a decision be rendered and either party may, at its option, require that a new panel be selected as soon as possible, if practicable within 10 days.  If the original panel renders a decision within 10 days of the parties' request, that decision shall be considered the decision of the panel.  If the original panel fails to decide within 10 days, the original panel shall have no authority, and shall not be compensated for its services.  The new panel shall have 45 days after it is constituted in which to render a decision.  The parties agree to proceed with due diligence and good faith in the procedure to be utilized in selecting a second panel as well as in assisting the panel in familiarizing itself with the issue(s).

17.  If the new panel fails to render a decision within 45 days, the Complaining Party may proceed to the United States District Court in which the case was originally filed for relief.

65

18.   The parties, by mutual consent, may extend any time period set forth in the ADR procedures.

G.   <u>Construction</u>

The parties enter into this Settlement Agreement voluntarily and it does not constitute an admission of the merits of any position taken by any party to this litigation, nor of any liability by the defendant for the violation of any law, statute, regulation, or policy.

H.   <u>Collateral Use Of The Agreement Prohibited</u>

The parties to this action have entered into this Agreement as a compromise measure to terminate this action and resolve all issues in the class complaint filed in this action.  The terms of this Agreement, the negotiations leading up to this agreement, the data, documents, or information exchanged between the parties in the course of those negotiations, may not be offered, taken, construed, or introduced as evidence of liability or as an admission or statement of wrongdoing by the FBI, either in this action or in any subsequent proceeding of any nature.

I.   <u>Attorneys' Fees and Expenses</u>

1.   The FBI agrees, upon the final approval of this Settlement Agreement by the Court, to pay reasonable attorneys' fees and expenses incurred by plaintiffs, B.A.D.G.E., Inc., members of B.A.D.G.E.,

66

Inc. and their counsel and experts for services incurred from March 5, 1991, through the final judgment approving this settlement by a district court as fair.

2.    The FBI agrees that it will not challenge the plaintiffs' entitlement to reasonable fees and expenses and plaintiffs agree to seek fees in one petition and not to seek an enhancement during settlement negotiations.  If the parties' negotiations fail to reach agreement and the matter is submitted to the Court for resolution, plaintiffs reserve the right to seek the full amount of fees and expenses allowed by law.

J.    Counterparts

This Settlement Agreement may be executed in one or more counterparts and each executed copy shall be deemed an original which shall be binding upon all parties hereto.

K.    Entire Agreement

This Settlement Agreement, including all appendices attached hereto, constitutes the entire agreement between and among the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.

67

L.  Non-Waiver

The waiver by any party hereto to any term, condition or covenant of this Settlement Agreement or of the breach of any term, condition, covenant or representation herein, in any one instance shall not operate as or be deemed to be a waiver of the right to enforce any other term, condition or representation nor shall any failure by any party at any time to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such party's right at a later time to enforce or require performance of such provisions or of any other provision hereof.

M.  Headings

The headings in this Settlement Agreement are for the convenience of the parties only and shall not limit, expand, modify, amplify or aid in the interpretation or construction of this Settlement Agreement.

68

N.    Extension of Time by Agreement of the Parties

All time deadlines established in this agreement may be extended by agreement of the parties to this agreement.

Stuart M. Gerson
Acting Attorney General


David J. Shaffer
Semmes, Bowen and Semmes
1025 Connecticut Avenue, N.W.
Washington, D.C.   20036
(202) 778-8686
D.C. Bar Number 413484

Anne M. Gulyassy
Department of Justice
Civil Division
Federal Programs Branch
901 E St., N.W.
Washington, D.C.   20535


Jeffrey L. Taren
Kinoy, Taren, Geraghty
   & Potter
332 S. Michigan Ave.
Suite 1705
(312) 663-5120
Counsel for Plaintiffs

Joseph R. Davis
Assistant Director - Legal Counsel
Federal Bureau of Investigation
9th & Pennsylvania
Washington, D.C.   20535


Signed: 1-26-93

SO ORDERED.


_____
United States District Judge

69